Barbara DEEGAN, and J.T., by his next friend Barbara Deegan, Plaintiffs-Appellants,†

v.

JEFFERSON COUNTY, the Jefferson County Department of Human Services, Kathie Gerber, and Keren Pomp, Defendants-Respondents.

Court of Appeals

*No. 93–3408. Submitted on briefs September 14, 1994.—Decided October 27, 1994.*

(Also reported in 525 N.W.2d 149.)

†Petition to review denied.

For the plaintiffs-appellants the cause was submitted on the briefs of *John F. Ebbott* and *Jeffery R. Myer* of *Legal Action of Wisconsin, Inc.* of Milwaukee.

For the defendants-respondents the cause was submitted on the brief of *Charles H. Bohl, Pamela M. Schmidt,* and *Laurie J. McLeRoy* of *Whyte Hirschboeck Dudek, S.C.* of Milwaukee.

Before Eich, C.J., Dykman and Sundby, JJ.

EICH, C.J.  After prevailing in a proceeding instituted by the Jefferson County Department of Human Services to terminate her parental rights to her son, J.T., Barbara Deegan sued the County and two of the social workers assigned to her case for damages, claiming that the workers had "intentionally, willfully and maliciously" engaged in a conspiracy to separate her from her child and failed to perform their duties under ch. 48, STATS., to assist her in keeping and caring for the child.[1]

The trial court granted the defendants' motion to dismiss and for summary judgment, concluding that

---

[1] In her original complaint, Deegan alleged that the defendants had violated her (and her son's) civil rights—in particular, their right to "reunification." The case was then removed to federal district court, and the district court granted the defendants' motion to dismiss with prejudice, concluding that Deegan had lost any rights to "family integrity" when she abandoned the child and failed to provide for his care and later requested the County's services. The district court also held that even if the social workers had violated Deegan's claimed "right of family integrity," they were entitled to qualified immunity.

Deegan's remaining state law claims were remanded to the circuit court for Jefferson County, and the defendants moved to dismiss for failure to state a claim and for summary judgment. Shortly thereafter, Deegan amended her complaint to add allegations of "intent" and "malice." This appeal is from the circuit court's order granting the defendants' motion to dismiss and for summary judgment.

Deegan had failed to state a claim for money damages, either at common law for interfering with her right to "family unity" or under the statutes prescribing the duties of the County and its employees in providing social services to those in need of them. Alternatively, the court held that, even if such a "family unity" cause of action existed, and even if Deegan had stated a statutory claim, the social workers would be entitled to dismissal because they were immune from liability for their discretionary acts and, further, that Deegan's general allegations of malice were insufficient to pierce that immunity.

The issues Deegan raises on appeal are: (1) whether Wisconsin law recognizes a cause of action for damages for a governmental employee's intentional, willful and malicious interference with the right to "family unity"; and, if so, (2) whether there are disputed factual issues regarding Deegan's allegations of intent and malice that would render summary judgment inappropriate on the question of the defendants' immunity. Deegan has not persuaded us that the cause of action she asserts is recognized in the law of Wisconsin, but even if she were to prevail on that argument, she has failed to raise a disputed factual issue on her claim of malice. We therefore affirm the order.

The underlying facts are not in dispute. J.T. was born in April 1989 when Deegan was seventeen years old and living in a foster home in Jefferson County. A few months later, Deegan ran away from the home with her boyfriend, taking J.T. with her, and was later arrested in Tennessee on charges of petty larceny. In November 1989, the court entered an order under § 48.13(4), STATS., finding—on Deegan's own petition—that J.T. was in need of protection and services because Deegan was unable to provide for his neces-

sary care.[2] The petition noted that Deegan, after being evicted from her apartment, had disappeared for nearly one month in late 1989, leaving J.T. with her mother. Since Deegan's mother had recently terminated her parental rights to her own daughter (Deegan's sister), County social workers considered her an inappropriate caretaker for the child and believed that Deegan's act placed the child at "risk."

The court's order finding J.T. in need of protection or services mandated that Deegan participate in parental counseling. The order also directed the department to provide a "parent aide" and "respite" at a designated foster home.

On February 10, 1990, Deegan again disappeared after dropping off J.T. at her mother's home and leaving him in the care of a twelve-year-old child, with a note saying she would be back in three days. When she did not return as promised, her mother delivered J.T.

---

[2] Section 48.13, STATS., gives the juvenile court jurisdiction over children alleged to be in need of protection or services in cases, among others, where the parent "signs the petition requesting jurisdiction and states that he or she is unable to care for, control or provide necessary special treatment or care for the child." Section 48.13(4). Under other provisions of ch. 48, the court may, upon adjudging the child to be in need of protection or services, order that a variety of measures be undertaken, including out-of-home placement of the child, provision of services by state and county agencies and imposition of conditions to be met by the parent for the child's care and well-being. *See* §§ 48.345 and 48.355, STATS.

As will be seen below, Deegan claims that when she signed the petition she believed it was necessary in order to obtain parenting assistance but did not recall being told that the document indicated she was unable to provide for the child's needs. As will also be seen, we do not consider that assertion to raise an issue of material fact.

to the department and "emergency" proceedings were instituted to place J.T. in a foster home. On February 19 Deegan learned that J.T. had been placed in foster care, but did not contact the department. In succeeding days and weeks the department attempted to contact Deegan without success and, on March 6, 1990, the assigned caseworker, Kathie Gerber, petitioned the court for revision of the November order to transfer J.T.'s legal custody to the department and to set conditions for his return to Deegan. Gerber continued to attempt to contact Deegan and finally, on March 26, Deegan called the department and informed Gerber that she was living in Neenah.

The department notified Deegan of the hearing on its petition and she appeared without counsel. Finding that the department had "made reasonable efforts to keep [J.T.] in the home or with relatives" and that the grounds stated in the petition warranted a change in the earlier order, the court directed that J.T.'s custody be transferred to the department and that he remain in foster care. The order imposed several conditions for J.T.'s return to Deegan, including, among other things, that Deegan undergo a psychological evaluation, participate in individual or group therapy, attend parenting classes and demonstrate "adequate knowledge of the nutritional and health needs of J.T." The court warned Deegan of the potential termination of her parental rights to J.T. should she fail to meet the conditions stated in the order.

The department scheduled a "foster care review" for J.T. on May 4, 1990, and mailed a notice to Deegan's Neenah address. She did not attend. Then, on May 7, Deegan informed Gerber that she had joined a carnival and would be leaving Neenah. Gerber recommended that she find other employment and advised her that

joining a carnival would not aid her in getting J.T. back. From February 19, when Deegan learned of J.T.'s foster placement, to May 7, she visited him a total of six times.[3]

Between May 7 and the end of September 1990, Gerber continued to try—again unsuccessfully—to contact Deegan through her mother and through the carnival for which she was working. During that time J.T. was transferred to a new foster home because the original foster parent had become ill and was unable to care for him. Notice of the change was sent to Deegan's Neenah address.

On October 17, 1990, Deegan called the department and, several days later, came to see Keren Pomp, who by that time had succeeded Gerber as Deegan's caseworker. Pomp warned Deegan of the potential termination of her parental rights if she did not immediately resume visitation with J.T.[4] A few days later, Pomp petitioned the court to extend the dispositional order on grounds that Deegan had not complied with its terms and had not contacted J.T. for more than five and one-half months. That same day Deegan called to schedule a visit with J.T. for November 6, 1990, one day before Deegan's parental rights could have been terminated on grounds of abandonment. *See*

---

[3] Deegan asserts in her affidavits and briefs that her visits with J.T. were seriously curtailed by transportation difficulties which, she claims, the defendants did not remedy. Here, too, we do not consider this assertion to raise a contested issue of material fact insofar as her claim of malicious interference with the family unit is concerned.

[4] One of the grounds for termination of parental rights under § 48.415(1)(a)2, STATS., is the failure of a parent whose child is in out-of-home placement to "visit or communicate with the child for a period of 6 months . . . ."

§ 48.415(1)(a)2, STATS. After the visit, Deegan told Pomp that she was depressed, broke and unable to find work because she was pregnant.

Deegan appeared, with counsel, at the hearing on the department's petition to revise the order. She objected to several "return conditions" in the proposed order and the court removed them. The other conditions for J.T.'s return remained essentially the same as those in the prior order. The revised order, issued on December 7, 1990, also included written warnings to Deegan that failure to meet the conditions could result in termination of her parental rights.

Deegan's visits with J.T. in November and December "did not go very well," and by March 1991 a psychiatrist-observer recommended that the biweekly visits cease because they were harmful to J.T. Pomp then petitioned the court to revise the order yet again, this time to discontinue visitations until the caseworker and a psychiatrist deemed it appropriate for them to resume. She withdrew the motion when Deegan, through counsel, moved to terminate the order or, in the alternative, to revise it to establish a "permanency plan" designed to reunite Deegan and J.T. within two months.

The court granted Deegan's request, ordering preparation of a "needs assessment" and establishing a schedule of semiweekly one-hour visits between Deegan and J.T., with the ultimate objective of reuniting them. All other provisions of the previous order remained in effect. The revised order, to which all parties agreed, was to terminate on May 27, 1991, the date on which J.T. was to be returned to Deegan.

During April 1991, Deegan adhered to the visitation schedule, entered counseling and received parenting instruction from the aide appointed by the

department. In mid-month, Pomp petitioned the court to extend the order on grounds that Deegan had not yet met the conditions for J.T.'s return. Deegan continued the visitations and parental counseling and sought dismissal of the department's petition.

The court granted Deegan's request and ordered J.T. returned to her at the expiration date of the existing order, concluding that the department had "failed to make reasonable efforts to make it possible for [J.T.] to return to his home with [Deegan]" in the following respects:

(1)  failing to address Deegan's transportation, income, housing and daycare needs in its "needs assessment";

(2)  failing to develop a "permanency plan";

(3)  failing to "set out achievable dates by which the objectives of the permanency plan shall be achieved"; and

(4)  making visitations "difficult" for Deegan by scheduling them in Fort Atkinson and Janesville, rather than at Deegan's home, which was then in Watertown.

J.T. was returned to Deegan on May 27, 1991. On August 19, 1991, Deegan filed a notice of claim with Jefferson County alleging that the department had engaged in a plan to keep J.T. away from her and to terminate her parental rights. She asked for $468,000 in damages and filed this lawsuit shortly thereafter. Other facts will be discussed in the body of the opinion.

The trial court ruled that Deegan's claim for damages for the caseworkers' alleged violation of their statutory duties does not exist at law and, alternatively, concluded that because the affidavits filed by

Deegan in opposition to the defendants' motion for summary judgment dismissing the action were "conclusory" in nature and thus failed to state a prima facie case that the defendants had acted maliciously, Deegan had failed to overcome the immunity enjoyed by public officers and employees for acts undertaken in the course of their employment.[5]

## I. Sufficiency of Deegan's Amended Complaint

We first consider Deegan's argument that her complaint states a claim cognizable at law. Her amended complaint contains 136 "factual allegations" which, for the most part, assert various perceived shortcomings in the services provided to her by Gerber and Pomp.[6] The most serious of the allegations—those considered by the trial court to be relevant in some way to Dee-

[5] Generally, a public officer or employee is immune from personal liability for injuries resulting from acts performed within the scope of his or her public employment. This immunity is not absolute, however, in that the officer may be liable for damages resulting from the negligent performance of a purely ministerial duty and, in any case, "a public officer is afforded no immunity for conduct that is malicious, wilful and intentional." *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 425, 474 N.W.2d 799, 801 (Ct. App. 1991).

[6] Generally, she alleges—as the trial court found in terminating the placement order—that the caseworkers failed to adequately carry out their responsibilities to assist her in meeting the conditions of the various orders, and that overall Gerber and Pomp were not as helpful as her former caseworker, David Chapman, had been. She claims, for example, that they did not provide her the same type of help in finding a place to live or in cooking, budgeting, and so forth as the former caseworker did, and she cites several examples of their failure to "investigate and develop resources" to obtain necessary services for her.

gan's generalized claim of "malice"—are that Gerber and Pomp, either together or individually:

31.  [D]eliberately failed to include services [in the treatment plan] which would improve the conditions of [Deegan's] home to facilitate [J.T.'s] return . ; . .

. . . .

33.  [P]lanned to work toward J.T.'s adoption [by a relative] . . . .

. . . .

47.  [I]nduced [Deegan] to sign an authorization to release information to the relative . . . who wanted to . . . adopt J.T. . . . .

. . . .

68.  [N]ever developed, in any plan, a goal or objective of permanent placement [of J.T.] with [Deegan].

. . . .

71.  [A]ttempted to facilitate the transfer[ ] of J.T.'s affection from [Deegan] and her family to the [relative] with the goal of [terminating Deegan's parental rights] and adoption.

. . . .

81.  [Were predisposed] to cut [Deegan] off from visiting J.T., and told the potentially adopti[ve] foster parent that.

. . . .

102.  [S]cheduled visits [with J.T.] far from [Deegan's] home and during J.T.'s nap time (which worsened his mood) . . . .

. . . .

133. [R]efused to comply with [the court] order and help [Deegan] with the return . . . .

The complaint then sets forth two causes of action based on those allegations: (1) denial of Deegan's and J.T.'s "common law right to family unity"; and (2) injury by "intentionally, willfully and maliciously ignoring and failing to perform" the duties imposed on the department and its employees by ch. 48, STATS.[7]

Deegan's argument that she has stated a cognizable claim is based in large part on the supreme court's

---

[7] The "duties" Deegan claims Gerber, Pomp and the department violated are many. She first claims they violated several of the underlying legislative purposes of ch. 48, STATS., as stated in § 48.01(b), (e) and (g): to "provide for the care, protection and wholesome mental and physical development of children, preserving the unity of the family whenever possible"; to "respond to children's needs for care and treatment . . . and to keep children in their homes whenever possible"; to "provide children in the state with permanent and stable family relationships"; and to "assist parents in changing any circumstances in the home which might harm the child or . . . require the child to be placed outside the home."

She then points to several other statutes, claiming that the defendants violated them as well: § 48.069(1)(c), STATS., which provides that the department should "[m]ake an affirmative effort to obtain necessary or desired services for the child and the child's family and investigate and develop resources toward that end"; and several subsections of § 48.355, STATS., which prescribe the contents of court orders in CHIPS cases, including provisions stating it to be the intent of such orders to, among other things, preserve "the family unit." Section 48.355(1). She also points to statutes requiring the department to make "reasonable efforts" to keep the child in his or her family home and to make and periodically review plans directed toward those and other objectives of the statute. Sections 48.355(2)(b)6 and 48.38(5), STATS.

decision in *Barstad v. Frazier*, 118 Wis. 2d 549, 348 N.W.2d 479 (1984). *Barstad* involved a custody dispute between a parent and a grandparent, and the sole issue was "the standard to be applied in a custody dispute between a parent and a third party." *Id.* at 551, 348 N.W.2d at 481. In the course of its decision (which reversed the trial court's award of custody to the grandmother), the court stated:

> Under ordinary circumstances, a natural parent has a protected right under both state law and the United States Constitution to rear his or her children free from governmental intervention. Absent compelling reasons narrowly defined, it is not within the power of the court to displace a fit and able parent simply because in the court's view someone else could do a "better job" of "parenting."

*Id.* at 567-68, 348 N.W.2d at 488-89.

As the defendants point out, however, *Barstad* arose under the custody provisions of the family code, ch. 767, STATS., when the grandmother commenced an action to have the child's custody transferred from the mother to her. The supreme court, concluding that "the rule to be followed in custody disputes between parents and third parties is that a parent is entitled to custody . . . unless the parent is either unfit or unable to care for the children or there are [other] compelling reasons for awarding custody to a third party," found no such reasons present and confirmed custody in the parent. *Barstad*, 118 Wis. 2d at 568-70, 348 N.W.2d at 489-90. Because *Barstad* arose under a different chapter of the statutes, with different principles and considerations at stake, and because the *Barstad* court itself recognized that "what are called parental 'rights' are both rights and responsibilities, and . . . neglect of one's

557

responsibilities can result in a forfeiture of one's rights," *id.* at 568, 348 N.W.2d at 489, we do not consider the case as persuasive authority for recognizing Deegan's claimed cause of action.

Deegan next argues that we should recognize her claim under article I, section 9, of the Wisconsin Constitution, which provides, in part, that "[e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character . . . ." As Deegan points out, the supreme court has interpreted this provision to provide that " '[w]hen an adequate remedy or forum does not exist to resolve disputes or provide due process, the courts . . . can fashion an adequate remedy.' " *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 182, 342 N.W.2d 37, 45 (quoting *In re D.H.*, 76 Wis. 2d 286, 294, 251 N.W.2d 196, 201 (1977), *cert. denied,* 469 U.S. 826 (1984)). Article I, section 9, however, confers no legal right to sue.

> "That section [the certain remedy clause], though of great importance in our jurisprudence, is primarily addressed to the right of persons to have access to the courts and to obtain justice *on the basis of the law as it in fact exists.* No legal rights are conferred by this portion of the Constitution."

*Oliver v. Travelers Ins. Co.*, 103 Wis. 2d 644, 650, 309 N.W.2d 383, 386 (Ct. App. 1981) (emphasis added) (quoting *Mulder v. Acme-Cleveland Corp.*, 95 Wis. 2d 173, 189-90, 290 N.W.2d 276, 284 (1980)).

Deegan alleges in her complaint that Gerber and Pomp intentionally failed to carry out the responsibilities assigned to the department under various provisions of ch. 48, STATS., and by the court's dispositional order. As the supreme court stated in *McNeill v.*

*Jacobson*, 55 Wis. 2d 254, 259, 198 N.W.2d 611, 614 (1972), a statute that does not itself create a civil liability, "but merely makes provision to secure the . . . welfare of the public . . . is not subject to a construction establishing a civil liability." We followed that rule in *Leahy v. Kenosha Memorial Hosp.*, 118 Wis. 2d 441, 449-50, 348 N.W.2d 607, 612 (Ct. App. 1984), and we see nothing in the statutes Deegan cites that would give rise to the cause of action she asserts. The court of appeals is primarily an error-correcting court, and if, as Deegan suggests, there are policy reasons for recognizing such a claim, her arguments are best directed to the state's highest court, wherein the law-declaring function primarily resides.

In any event, we agree with the trial court that even if such a cause of action were to be recognized, Deegan's claim would fail because the defendants are entitled to claim immunity from suit for actions undertaken in the course of their employment as public employees.

## II. Immunity

Deegan's initial complaint in this action alleged that Gerber and Pomp (and the department), in violation of her and J.T.'s federal civil rights and their rights under state law, intentionally planned to terminate her parental rights to J.T. without reasonable cause. As indicated, the case was removed to federal district court and the defendants moved to dismiss for failure to state a claim, or in the alternative, for summary judgment. The district court granted the motion, concluding that the defendants did not violate Deegan's civil rights and, further, even if they had, they were entitled to qualified immunity because they did not violate "a clearly established right of which a reason-

able person would have known." The court remanded the remaining state claims to the circuit court for Jefferson County.

■

The defendants filed motions to dismiss and for summary judgment, claiming first that the cause of action Deegan attempted to state in the complaint did not exist, and second, that they were immune from liability for their actions. Deegan, in an apparent attempt to overcome the immunity defense, then amended her complaint to add allegations that the defendants' actions were undertaken "intentionally, willfully and maliciously." As we have noted above, public officers and employees enjoy immunity from suit for discretionary actions undertaken in the scope of their public employment. *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 425, 474 N.W.2d 799, 801 (Ct. App. 1991). As we also have indicated—and as Deegan acknowledges in her brief—the "[d]efendants are immune from liability for damages in this case unless their conduct is 'malicious.' "[8]

The defendants' summary judgment motion was accompanied by affidavits incorporating extensive materials and exhibits from the department's file on Deegan's case and excerpting deposition testimony outlining the actions the workers took in her case. They asserted that all such actions were undertaken in the exercise of their discretion as professional social work-

[8] Because Deegan has thus conceded that the other conditions for immunity exist—that the defendants' actions were either quasi-legislative or quasi-judicial in nature, *see* § 893.80 (4), STATS.—it is unnecessary to consider such issues and our discussion is properly confined to whether she has shown the existence of disputed issues of material fact, or factual inferences, with respect to her claim of malice.

ers. The affidavits submitted by Deegan in opposition to the summary judgment motion also summarize Gerber's and Pomp's actions and activities and largely restate and amplify the factual allegations stated in her amended complaint. She argues that only one inference may reasonably be drawn from those facts: that Gerber and Pomp willfully and maliciously attempted to separate her from J.T. The trial court disagreed with that assertion, as do we.

■■■

To prevail on a motion for summary judgment dismissing an action, a defendant must establish a prima facie defense that defeats the plaintiff's claim, and it must also appear that no triable issue of material fact exists and that summary judgment is appropriate under the law. *Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580, 582-83 (Ct. App. 1983). The party opposing the motion (Deegan) may not rest on the allegations of the complaint, but must establish a triable issue of material fact. *E.S. v. Seitz*, 141 Wis. 2d 180, 186, 413 N.W.2d 670, 673 (Ct. App. 1987).

Deegan, citing *N.N. v. Moraine Mut. Ins. Co.*, 148 Wis. 2d 311, 434 N.W.2d 845 (Ct. App. 1988), *rev'd*, 153 Wis. 2d 84, 450 N.W.2d 445 (1990), argues that her case centers on the defendants' "intent," and that intent is a factual issue that should not be decided on a motion for summary judgment. As indicated, however, *N.N.* was reversed, and the supreme court recognized in that case that, while intent may be difficult to resolve on summary judgment, where the facts and factual inferences "lead to only one valid conclusion," summary judgment is appropriate. *N.N.*, 153 Wis. 2d at 96, 450 N.W.2d at 450.

Deegan's affidavits in opposition to the motion are voluminous. Her attorneys filed affidavits compiling

the department's extensive case records on Deegan. These records, on which the department also relies, are undisputed. Deegan's attorneys also filed excerpts from the depositions of Deegan, Gerber, Pomp and Chapman, the social worker who first handled Deegan's case. While the excerpts from Deegan's deposition purport to explain some of her conduct, the facts put forth are undisputed to the extent they have any bearing on her claim of malice. Deegan also filed her own affidavit in which she explains her conduct and activities and disagrees with various other facts that are largely immaterial to the issue of malice.[9]

Taken in their entirety, Deegan's affidavits claim no more than that the defendants did not satisfactorily perform the tasks required of them under the statutes and the court's order and, further, that they were attempting to seek a permanent out-of-home placement for J.T. rather than restore him to Deegan's custody. The department plays a significant role in cases involving children in need of protection or services, and the polestar of ch. 48, STATS., is the protection and advancement of the child's best interests. As the defendants point out, the statutes set forth

---

[9] She states, for example—apparently to contradict statements from the defendants that at one point she indicated it might be best that her parental rights to J.T. be terminated—that she "d[id] not recall telling [the department] that it would be best for . . . J.T. if I would terminate my parental rights . . . ." She also states that when she signed the petition declaring J.T. a child in need of protection or services, she did so "in order to obtain assistance in caring for . . . J.T.," and was unaware that the document "was an admission of my inability to care for [him]." Finally, she states that she signed the authorization to release information to prospective adoptive parents "[w]ithout advice of counsel."

numerous services and procedures through which the department can address a variety of situations in which a child may need assistance, from providing services to assist the family in maintaining the child at home to facilitating the termination of parental rights and the child's eventual adoption in appropriate cases.

We have also recounted undisputed facts that indicate to us that the acts of which Deegan principally complains—the social workers' attempts to facilitate J.T.'s adoption—may be considered appropriate acts of discretion in light of the statutory guidelines and Deegan's behavior. We note as but one example Deegan's failure to make contact with the child until the day before the department could have terminated her parental rights under applicable statutes—and then only after Pomp advised her to do so. And we agree with the defendants that it would indeed have been questionable conduct on their part, in view of Deegan's apparent abandonment of the child, to wait until the six-month period had expired to begin planning for his future.

We do not draw from Deegan's affidavits any reasonable inference that Gerber and Pomp acted maliciously or with the intent to harm her and her son in supervising her case. The trial court's findings that the caseworkers failed to exercise sufficient diligence in working with her to justify extending the order a third or fourth time do not imply malice or intent to harm.

In *Harman v. La Crosse Tribune*, 117 Wis. 2d 448, 344 N.W.2d 536 (Ct. App.), *appeal dismissed and cert. denied*, 469 U.S. 803 (1984), Harman, a shareholder in a law firm, was discharged after he publicly accused the local newspaper—a client of the firm—of deliberately printing false information in violation of the

criminal code. *Id.* at 451, 344 N.W.2d at 538. He sued the other firm shareholders claiming, among other things, that they wrongfully interfered with his employment relationship with the firm. The defendants moved for summary judgment, advancing the well-recognized principle of law that corporate shareholders are not subject to suit for good faith acts done in the course of carrying out their responsibilities to the corporation. They claimed that Harman's actions had created a conflict of interest with one of their principal clients and that the termination of his employment was motivated by a desire to maintain the firm's good reputation. *Id.* at 455, 344 N.W.2d at 540. Harman opposed the motion, claiming that the shareholders' "conditional privilege" was destroyed by their "wrongful motive" in seeking his termination. *Id.* He argued that such wrongful motives could be inferred from the undisputed facts that he was fired immediately after his accusations were made public, that the shareholders produced no evidence that his accusations were false, and that although he consulted with several of them before making the accusations, none advised him that it would create a conflict of interest for the firm. He claimed those facts gave rise to an inference of a bad-faith firing in retaliation for his actions. *Id.* at 456, 344 N.W.2d at 540-41. We rejected the argument, concluding that Harman "ha[d] presented no factual material from which a reasonable jury could infer that the shareholders lacked good faith." *Id.* at 457, 344 N.W.2d at 541. And because he had failed to establish the existence of "a genuine issue as to any material fact," we upheld the trial court's entry of summary judgment dismissing Harman's action. *Id.*

The same reasoning, and the same result, obtains here. Not only has Deegan failed to establish the existence of a disputed issue of material fact—or reasonable inferences from undisputed facts—with respect to her allegations of malice, but our own review of the affidavits and other proofs filed in connection with the summary judgment motion satisfies us that the only reasonable inference from the undisputed facts is that the defendants' actions in this case were not motivated by malice or ill will toward Deegan or her son.

Because Deegan has not persuaded us that her complaint states a cognizable claim under Wisconsin law—or that we should create the cause of action she advocates—and because, even if such a claim did exist, the defendants are protected by the immunity afforded to public officials acting in the course of their employment, we affirm the order.

*By the Court.*—Order affirmed.

SUNDBY, J. (*dissenting*).

> Of all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive. . . . [T]hose who torment us for our own good will torment us without end for they do so with the approval of their own conscience.

Lewis, *The Humanitarian Theory of Punishment*, 6 RES JUDICATAE 224, 228 (1952), *quoted in* Joseph Goldstein, *Medical Care for the Child at Risk: On State Supervention of Parental Autonomy*, 86 YALE L.J. 645, 645 (1977) (hereinafter *State Supervention of Parental Autonomy*).

The defendant caseworkers became convinced that J.T.'s interests could best be served by termination of Deegan's parental rights and adoption of J.T. by foster parents. To accomplish this well-meaning objective, the case workers (according to the complaint) deliberately denied Deegan and J.T. services and made visitation as difficult as possible.

The majority has detailed the facts of this case from the standpoint of the defendant social workers. I will set forth the facts as alleged by Deegan and J.T. I believe a jury could find that the facts are as Deegan recites them but could also find that the facts are as detailed by the majority. The defendants, who have moved for summary judgment, bear the burden of showing the absence of a genuine, that is, disputed, issue as to any material fact. *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473, 477 (1980).

> A summary judgment should not be granted unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy; some courts have said that summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt.

*Id.* Any inference to be drawn from the underlying facts as shown in the party's proof is to be drawn in favor of the party opposing the motion for summary judgment. *Id.* at 339, 294 N.W.2d at 477.

If Deegan and J.T.'s complaint can survive the first step of summary judgment methodology—whether the complaint states a claim—they are entitled to a trial of the disputed issues of material fact.

The majority concludes that Deegan and her son do not state a claim because: (1) there is no cause of

action against a person who interferes with "family unity"; and (2) the caseworkers are immune from liability because all actions which they took were discretionary and within the scope of their public employment.

Perhaps Deegan and J.T. should have used words more familiar than "family unity" to express familial rights: for example, "the integrity of the family unit," "parental autonomy," "parental rights," or "protection of the family relationship from state intrusion." We should not be put off by Deegan and J.T.'s use of a term less descriptive than some others; we should examine the nature of the relationship and the claimed right, whatever label is given to it.

The decisions which protect the family relationship from state intrusion are legion. *See, e.g., State Supervention of Parental Autonomy*, 86 Yale L.J. at 646 n.5. Not only is the family protected from unwarranted state intrusion under the federal constitution, it is protected by common law tort law. The "familial bond" of the parent-child relationship is a "reciprocal right." *See Stanley v. Illinois*, 405 U.S. 645, 647, 652 (1972).

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "[r]ights far more precious . . . than property rights," . . . . The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment.

*Id.* at 651 (citations omitted).

"The right to family privacy and parental autonomy, as well as the reciprocal liberty interest of parent

567

and child in the familial bond between them, need no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity." *State Supervention of Parental Autonomy*, 86 Yale L.J. at 649 (citing Robert H. Mnookin, *Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy*, 39 LAW & CONTEMP. PROBS. 226, 266-67 (1975)).

The entitlement of natural parents and their children to each other is an interest which rests on the fact of biological reproduction and arises when the child is born. *Id.* at 649 n.12. However, the right of parents and children to each other is not an unconditional right. Circumstances may require that the state intrude in the family. However, the law *does* require that the state's intrusion be as limited as possible. Even where a parent cannot or will not provide a traditional home for a child because of personal circumstances, that does not give the state the right to rearrange the family relationship simply because the state concludes that it is better equipped to decide what is in the child's best interest than the natural parents. There are cases where that may be true; this is not one of those cases.

While Deegan did not do all that she could to bond with J.T. and keep that bond fresh, throughout she was unwavering in her commitment to J.T., including her commitment that he be properly cared for.

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

*Santosky v. Kramer,* 455 U.S. 745, 753 (1982).

The only fair inference which may be drawn from the record is that the defendant caseworkers believed that it was in J.T.'s best interest to terminate his mother's parental rights and place him with adoptive parents. A jury could readily infer that once the caseworkers became so convinced, they abandoned any attempt to reunite Deegan and her son and worked to terminate Deegan's parental rights and place J.T. with foster or adoptive parents. What happened in this case is exactly what the United States Supreme Court warned against in *Santosky v. Kramer,* where the court said: "Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination." *Id.* at 763.

A jury could infer from the evidence that the caseworkers attempted to shape the historical events to provide a basis for termination of Deegan's parental rights. Deegan is entitled to a trial on that issue.

Finally, respondents argue that "even if the facts supported the plaintiff's allegations, the defendants would be entitled to summary judgment in their favor as a result of their statutory governmental immunity." I assume they intend to refer to the general rule, now codified in § 893.80(4), STATS., that a public officer is not personally liable to one injured as the result of an act performed within the scope of his or her official authority and in the line of his or her official duty. *Lister v. Board of Regents,* 72 Wis. 2d 282, 300, 240 N.W.2d 610, 621 (1976). As the court said therein, "the most generally favored principle is that public officers are immune from liability for damages resulting from their negligence or *unintentional* fault in the performance of discretionary functions." *Id.* at 301, 240 N.W.2d

at 622 (emphasis added). Public officers are, however, personally liable for "intentional misconduct." *See id.* at 302, 240 N.W.2d at 622. The court dismissed Lister's complaint because it did not contain an allegation of malicious *or* intentional misconduct on the part of the University Registrar. "Otherwise stated, there is no substantive liability for damages resulting from mistakes in judgment where the officer is specifically empowered to exercise such judgment." *Id.* at 301-02, 240 N.W.2d at 622.

An exception to public officer immunity exists when the act of the officer is intentional. There is no immunity for the public officer who does not exercise his or her discretion in good faith but intentionally fails to perform his or her duties to accomplish a purpose falling outside the employee's scope of employment.

In this case, the trial court found that the defendant caseworkers had not carried out the court's dispositional order of April 30, 1991. The court found that defendant Keren Pomp had not complied with the court's order in a number of respects. For example, the court concluded that she and the department made Deegan's visitation with J.T. difficult. This case is not unlike *Acevedo v. Pima County Adult Probation Department*, 690 P.2d 38 (Ariz. 1984), where probation officers acted contrary to a court order. The court said that the probation officers could not invoke judicial immunity when they acted contrary to the court's directive. *Id.* at 41.

We must accept the allegations of the complaint as true for purposes of determining whether Deegan and J.T. state a claim. The majority does not follow summary judgment methodology and does not consider whether Deegan and her son state a claim when the allegations of their complaint are accepted as true. The

majority simply concludes that defendants are protected by the immunity afforded to public officials acting in the course of their employment. The trial court also skipped the first step of summary judgment methodology. The court proceeded directly to the parties' proofs and concluded that the affidavits filed by Deegan were conclusory in nature and failed to state a *prima facie* case in opposition to defendants' motion for summary judgment. The trial court erred in this respect in that Deegan was not required to state a *prima facie* case; that was the burden of the defendants. I believe what the trial court intended to say was that Deegan's and J.T.'s affidavits failed to rebut defendants' *prima facie* case.

We apply the same methodology to summary judgment as does the trial court. *Biggart v. Barstad*, 182 Wis. 2d 421, 427-28, 513 N.W.2d 681, 683 (Ct. App. 1994). Therefore, we must look first to Deegan and J.T.'s complaint to determine whether they state a claim. *See Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580, 582-83 (Ct. App. 1983). We must accept the facts alleged as admitted. *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 683, 271 N.W.2d 368, 372 (1978). The complaint contains 136 allegations. I have reviewed those allegations and conclude that if they are taken as admitted, they state a claim that the caseworkers intentionally engaged in a course of conduct, plan and campaign to remove J.T. from his mother; to terminate Deegan's parental rights to J.T.; and to have J.T. adopted by other persons. I conclude that Deegan and J.T.'s complaint states a claim.

The majority concludes, however, that defendants' proof establishes a *prima facie* defense to Deegan and J.T.'s complaint. The majority concludes that Deegan's affidavits show nothing more than that the

caseworkers did not perform the tasks required of them under ch. 48, STATS., and the juvenile court's dispositional orders, and further, that the caseworkers were attempting to seek permanent out-of-home placement for J.T. rather than restoring him to Deegan's custody. Maj. Op. at 562. The majority also concludes that the caseworkers' attempts to terminate Deegan's parental rights and have J.T. adopted are "appropriate acts of discretion." *Id.* at 563. This conclusion wholly ignores the trial court's findings that caseworker Pomp did not comply with the juvenile court's dispositional order. Immunity disappears when a caseworker operating under a court order deliberately violates the court order to achieve an objective not contemplated by the juvenile court.

In any event, the submissions of the parties raise genuine issues of material facts which must be tried. In conclusion, I set forth those facts.

J.T. was born April 13, 1989, when his mother, Barbara Deegan, was seventeen years' old. On August 9, 1989, when Deegan was in foster care, the department persuaded her to sign an informal disposition agreement. The agreement was reached after Deegan ran away from her foster home with her son. On November 24, 1989, the juvenile court entered a dispositional order for J.T. in response to Deegan's petition. The court ordered counseling for her and supervision of J.T. by the department. On February 10, 1990, Deegan left J.T. at her mother's home. She left a note saying she would return in three days. When she did not, Deegan's mother delivered J.T. to the department and left him in its custody.

The department filed an emergency notice of change in placement, seeking to place J.T. in a foster home. On February 14, 1990, J.T. was placed in tempo-

rary physical custody of foster parents. On February 19, 1990, Deegan learned that J.T. had been taken to the department. Initially, Deegan received a great deal of help from the department. Apparently, she established a good relationship with the caseworker.

The November 24, 1989 dispositional order placed J.T. with his mother under supervision of the department. The order required the department to provide Deegan and J.T. with a number of services, including a parent aide, respite and community support. However, the defendant social workers did not provide Deegan and J.T. with these services.

Between the entry of this order and February 10, 1990, Deegan lived in several different places. Although she cared for J.T. during this period, she was unable to arrange a long-term, stable place to live and a supportive environment. On December 15, 1989, defendant Kathie Gerber became Deegan's case manager and counselor. Gerber left on maternity leave and returned to work January 8 or 9, 1990. In January and February 1990, Gerber made no effort to obtain necessary or desired services for Deegan and J.T. or to investigate and develop resources toward that end.

On February 1, 1990, an authorization for out-of-home placement of J.T. was pre-approved by the department's Alternate Care Supervisor.

Sometime after February 14, 1990, Gerber completed a "Request for Alternate Care Placement/Permanency Plan" which did not state that its goal was to keep Deegan and J.T. together and contained no services to meet Deegan's needs. The plan did not contain a time table for reuniting Deegan and J.T. On or about February 20, 1990, Gerber discussed termination of Deegan's parental rights and adoption of J.T. with a relative of Deegan's step-father.

On March 6, 1990, Gerber filed a petition to revise the dispositional order to add ten requirements which Deegan would have to satisfy to regain custody of J.T. On March 12, 1990, Gerber again spoke to the relative who was interested in adopting J.T. Gerber expressed the opinion that it was probably Deegan's "best bet" to voluntarily terminate her parental rights to J.T. and allow him to be adopted. On March 19, Gerber gave the relative and her parents permission to visit J.T. at the foster home. Between January 1990 and May 1990, Gerber did not provide Deegan with housing or employment services.

In March 1990, Deegan moved to Neenah, and on March 26, she called Gerber to ask about J.T. and told her that she wanted him back. However, Gerber did not tell Deegan where J.T. had been placed and did not prepare a permanency plan to reunite Deegan with her son. On April 3, 1990, Deegan arranged for a friend to drive her to Jefferson to speak with Gerber and to visit J.T. At that time, Gerber discussed with Deegan the possibility of terminating her parental rights. Deegan said that she was not interested and wanted to work on keeping her son. Despite Deegan's rejection of Gerber's proposal, on April 6, 1990, the department asked the state adoption agency to get involved, suggesting that this was "a possible TPR case."

On April 10, 1990, the date of the hearing on Gerber's petition, Deegan arranged to be driven from Neenah to visit J.T. under supervised visitation. At that time, Gerber induced Deegan to sign an authorization to release information to the relative interested in adopting J.T. Gerber failed to inform Deegan that the purpose of this information was to further Gerber's plan to pursue TPR and adoption.

On April 12, 1990, the juvenile court entered an order revising the previous dispositional order and imposing conditions on Deegan for the return of J.T. The court transferred legal custody of J.T. to the department.

On April 16, 23, and 30, Deegan again arranged for a friend to drive her from Neenah to Jefferson to visit J.T. Gerber did not offer to place J.T. in the Neenah area so that he could be closer to Deegan. Gerber did not offer to help Deegan obtain transportation to visit J.T. nor did she offer housing or employment services.

On May 4, 1990, Deegan accepted employment with a midway operating out of Oshkosh. On May 7, she informed Gerber of this proposed employment and that she would try to let Gerber know where she was and would try to schedule visitations when she was available. Gerber did not offer to help Deegan obtain other employment or job training; she told Deegan that "it didn't sound like J.T. was her first priority."

As of May 7, Gerber knew that Deegan would not reside in Neenah after May 13. Nonetheless, on May 17, and June 11, 1990, Gerber addressed letters to Deegan at her former address in Neenah, encouraging her to receive services and visit J.T.

In mid-July 1990, Deegan was in Jefferson County working at her job. She telephoned Gerber to arrange visitation with J.T. but Gerber was not available. Gerber had, however, informed Deegan that visitation could be arranged only through her. About a week later, Deegan was in Beaver Dam and twice called Gerber to arrange visitation with J.T. but Gerber was not available.

On July 26, 1990, Gerber was contacted by another person interested in adopting J.T. In August 1990, with the assistance of the state adoption agency, Gerber

selected new foster parents for J.T.; they also wished to adopt him. On August 10, Gerber prepared a "Plan/Prescription Review" in which she described the "Goals of Service" as "work toward TPR unless mother shows some interest/cooperation." On the same day, Gerber prepared another "Plan/Prescription Review" for J.T., in which she entered as an "Objective[ ] with Expected Achievement Dates": "[c]hange [p]lacement to a permanent foster home."

Gerber never developed, in any plan, a goal or objective of reuniting J.T. with his mother. On August 15, 1990, Gerber changed J.T.'s placement from one foster home to another; her purpose was to have the new foster parents adopt J.T. On August 13, without a release, Gerber told the new foster parents about Deegan's background.

On September 11, 1990, Deegan's grandmother asked to visit J.T.; Gerber refused, stating she was postponing extended family visits "until [Deegan] becomes reinvolved in our system."

In September 1990, defendant Keren Pomp became Deegan and J.T.'s case manager. On October 1, Gerber, Pomp and the proposed adoptive mother attended an administrative review of J.T. and Deegan's case at which they decided to pursue termination of Deegan's parental rights.

On October 2, 1990, Pomp refused to discuss Deegan and J.T.'s situation with Deegan's grandmother, who had been J.T.'s principal caregiver in 1989. Pomp told her that the department was not at liberty to discuss the case without a release.

On October 16, 1990, when her job terminated, Deegan moved to Watertown, and the next day called the department and left a number where she could be reached. On October 22, Pomp and Deegan arranged to

meet on October 24. Before that meeting, Pomp told the prospective adoptive parents that she intended to terminate Deegan's right to visit J.T. On October 24, Deegan met with Pomp and another worker and informed them that she wanted J.T. back. On October 29, 1990, Deegan called Pomp to arrange visitation with J.T. However, on that date, Pomp petitioned the circuit court to extend and revise the dispositional order to prohibit visitation between Deegan and J.T. for at least two months. Pomp scheduled counseling with Deegan on November 1.

On October 30, Pomp completed a "Plan/Prescription Review," stating that the department's objectives were to "[p]ursue TPR as soon as possible and/or work with mother towards reunification." This plan failed to meet state requirements for a permanency plan and contained inherently contradictory objectives, which could not be pursued at the same time.

On November 6, 1990, Deegan visited J.T. under supervision. At this time, Deegan told Pomp that she was depressed over her situation, she was broke, she was unable to find work due to her pregnancy, and she didn't want AFDC. However, Pomp did not offer her any assistance to resolve these problems.

In November, Deegan obtained representation from the state public defender. On November 13, she filed a motion with the juvenile court to delete from the dispositional order the requirement that she obtain an AODA assessment and psychological evaluation. She also requested that the cut-off of her visitation with J.T. be deleted. On December 7, the juvenile court issued its order granting Deegan's motion.

On November 28, Pomp pursued with the state adoption worker the possible termination of Deegan's

parental rights and adoption of J.T. On November 30 and December 7, Deegan arranged transportation from Watertown so that she could keep her supervised visits with J.T. The visits were cancelled because J.T. became frightened and distraught. During her supervised visits, Pomp had another social worker sit behind a two-way mirror to observe the visitation.

During December 1990, Deegan was getting pressure from Pomp to voluntarily terminate her parental rights. Pomp asked Deegan whether she wanted a different counselor and she said that she did. On January 2, 1991, at Pomp's request, Deegan met with the prospective adoptive parents, the state adoption worker and Pomp to discuss termination of her parental rights and adoption of J.T. Deegan met with her new counselor on January 11, for the first and only time. The new worker did not develop a plan for Deegan and J.T. but transferred her case two weeks later.

On January 18, 1991, Deegan again visited J.T. under supervision. The observing social worker was joined behind the two-way mirror by a psychiatrist whose purpose was to document the "cruelty" to J.T. of having to see his mother. Pomp scheduled visits with J.T. far from Deegan's home and during J.T.'s nap time. Deegan visited J.T. at the department on February 1, February 7, March 1, and March 22, 1991. Pomp did not bring J.T. to visit Deegan at her home and did not attempt to provide transportation for Deegan from Watertown to Jefferson.

On February 7, 1991, Pomp completed a further "Plan/Prescription Review," the objective of which was to "work with [the] mother towards" reunification if the mother cooperated, otherwise, termination of her parental rights. This plan did not meet state law requirements for a permanency plan, and did not pro-

vide for Deegan's needs or contemplate reasonable efforts to reunify J.T. with his mother. On March 1, 1991, Pomp asked Deegan to stop seeing J.T. and threatened to petition the juvenile court for a revision of the dispositional order if Deegan did not agree. Deegan did not. Therefore, on March 4, Pomp petitioned the court to cut off Deegan's visitation with J.T. until she and the psychiatrist "deemed it appropriate." Her petition was supported by the psychiatrist's letter opining that continued visits were "cruel and punitive to the child." On March 22, Deegan visited J.T. On March 25, she filed a motion to terminate the dispositional order, or in the alternative, for a change in placement or to establish a permanency plan to reunify J.T. with her within two months.

On March 26 and 28, Deegan called Pomp to request the assistance of a parent aide. Pomp did not comply with her request.

On April 2, 1991, the juvenile court, after a hearing, revised the dispositional order to allow visitation other than at the department's offices. The order also increased Deegan's visitations to at least two times per week for more than one hour each, and not during J.T.'s normal nap time. The order required Pomp to prepare a needs assessment to be included in a permanency plan designed for reunification. The court also ordered that a counselor be appointed for Deegan and that the department be removed as protective payee for her. The court ordered that the ultimate objective in the matter was the return of J.T. to his mother.

On April 3, 1991, the department held an administrative review of Deegan and J.T.'s case which did not comply with § 48.38, STATS. On April 9, Pomp prepared a "Needs Assessment and Services Available" which included as "services available," the videotaping of visi-

tation sessions "if deemed necessary by the parent aide and/or case manager as a learning tool." The assessment also contained the conditions that Deegan remain where she was residing and be engaged to Michael Deegan for at least six months. On April 18, Deegan's attorneys objected to the assessment on several grounds.

Pomp continued to fail to provide transportation to Deegan for visitation or to arrange for visitation with J.T. in Deegan's home.

On April 5, 1991, the juvenile court assigned a parent aide to Deegan. She attended Deegan's visits with J.T. on April 12, 18, 22, 24, and May 2, and met with Deegan on May 7, 13, and 20. Deegan also visited with J.T., without the aide, on May 6, 9, 13, and 23, 1991.

On April 17, 1992, Pomp filed a petition with the court to extend the dispositional order to keep J.T. in the foster home until November 27, 1991. She stated in the petition that visitations had gone poorly, that mother/child bonding had not occurred, and that the "mother has not yet completed conditions for return."

On May 3, Deegan's attorney asked Pomp to end the two-way mirror supervision of Deegan's visits with her son. He also asked that, to enhance the bonding between Deegan and J.T., future visits not take place at the department. Pomp refused these requests.

On May 8, Deegan's attorney asked Pomp to instruct the foster parents not to mislead J.T. as to who his parents, grandparents and other relatives were.

The needs assessment was revised when the district attorney, the guardian ad litem and Deegan's attorneys agreed that it was insufficient. On May 16, 1991, Pomp revised the needs assessment to recognize and provide for Deegan's needs. The revised assess-

ment identified parenting skills and visitation transportation as needs. The other needs identified were stability in terms of residence and significant others for six months. The department offered counseling and case management, as requested. Other needs identified were stable income, housing, and adequate day care.

Deegan moved the court to dismiss Pomp's petition and to terminate the dispositional order. On May 23, 1991, after a hearing, the juvenile court ordered that the April 30, 1991 dispositional order terminate on May 27, 1991, and not be extended.

The court also ordered Pomp and the department to return J.T. to his mother no later than 3:00 p.m. on May 27, 1991. Pomp refused to comply with this order or to help Deegan with the return. Pomp told Deegan that she was not working on May 27, so Deegan would have to pick up J.T. herself. Deegan had to arrange transportation to Beloit to pick up J.T.

In its May 24, 1991 order requiring the department to return J.T. to his mother, the court made the following findings:

1. The court report contained no information as to how the dispositional order of April 30, 1991, had been meeting the objectives of any "Plan" for J.T.'s care and treatment.

2. There is no "plan" against which the court's order can be measured.

3. The report does not contain any evaluation of J.T.'s adjustment to his placement.

4. The report does not discuss J.T.'s visitation with his mother and his progress toward reunification with her, two major elements of J.T.'s placement under the court's April 30, 1991 dispositional order.

5. The report contains no suggestions for amendment of any permanency plan.

6. The report does not describe the department's efforts to return J.T. to his home.

7. The petitioner Pomp recommends continued placement of J.T. outside his mother's home.

8. The report contains no explanation of why returning J.T. to his mother is not feasible; it does not explain why J.T. should be kept in a foster home and away from his mother.

9. Petitioner does not explain whether all visitations have gone poorly, whether more recent visitations have improved, which conditions Deegan has not complied with or why those conditions compel J.T. to remain in foster care.

10. Petitioner Pomp "has not complied with this Court's April 30, 1991 Dispositional Order in the following respects":

(a) Deegan's need for transportation, income, housing or day care are not addressed.

(b) Petitioner and the department have not developed a permanency plan as required.

(c) Petitioner and the department have failed to determine "achievable dates" by which the objective of the permanency plan may be satisfied.

(d) Petitioner and the department have made visitations difficult for Deegan.

The court also found that Deegan had attended all of the visits with J.T. which the petitioner and the department scheduled. Deegan's counselor met with her only once since April 1991.

The court made conclusions of law that the department "has failed to make reasonable efforts to make it possible for [J.T.] to return to his home with [Deegan]"; that there is no basis under § 48.365, STATS., for

extending the court's dispositional order; and that, pursuant to § 48.365(1m), the dispositional order of April 30, 1991, may not be extended.

I infer from these facts that the department and the caseworkers believed in good faith that J.T.'s best interest lay in severing all relations between J.T. and his mother. The defendants may have exercised the awesome power of the state over Deegan and J.T. with the "approval of their own conscience." A jury may, however, infer that they abused the power of the state in the process and damaged J.T. and Deegan. These questions cannot be answered as a matter of law. Summary judgment was inappropriate. I dissent.